Good morning. May it please the court. Ready to shift gears. James Chapin on behalf of Appellant Adrian Moses. Adrian Moses had one of those split-second decisions to make that the Supreme Court counseled us not to evaluate the 2020 hindsight. And the reason we're doing that is because the plaintiffs have taken some factual discrepancies and elevated them to disputed material facts. Counsel, let me ask you this. Since the decision below, the Supreme Court decided the case of White v. Pauley. I'm sure you're familiar with it. What impact does that have on our deliberations? It reemphasizes the court's obligation to find clearly established law that's particularized to the facts of the case. And in this case, the district court did no such analysis. And in fact, the cases that are cited by the appellees are from two district courts, one in Nevada and one in Idaho. What's the closest appellate case that you can name that would have given your officer client a clear notice that he was violating the constitutional rights of the decedent? I don't think there is a clear case. Nothing close? There's nothing close that we could find. And I'm sure that the appellees would have found something if they could, and they highlighted only these two district court cases. And the district court cases, do you know what the facts of those cases were? I don't recall exactly. Do you remember the jurisdiction of the district court cases? One of them was Idaho, and one of them was Nevada. Okay. One of them was unpublished. And I think that this court would want to have the final say in what's clearly established law. Not admittedly, but I'm just, what I'm trying to understand is, as you well know, the Supreme Court has taken, I think, virtually all of the courts of appeal to tasks for looking at these actions at too high a level of generality. They're saying the officers, law enforcement officers, have to have clear notice that what they're doing is a violation of constitutional law. And if it's too high a generality, they don't have that notice, it's not fair, and therefore we grant qualified immunity, which of course is what your client wants. Exactly our position, and this is an interim interlocutory appeal on the qualified immunity issue. This is, if you look at the undisputed facts of this case, as testified by Kristen Bilyeu, she believed that Deputy Vores definitely would have been stabbed by Mr. Brown and believed that she would have been stabbed as well. And Deputy Moses testified that there was an imminent threat to Deputy Vores based on what he observed. He saw the knife coming out, he saw the blade, he described the length of the blade, he saw Mr. Brown moving forward, and he exercised his judgment in a split second to save his colleagues from serious bodily injury. Aren't there some issues of fact here, even an issue of fact, whether he could even see these people, the other two officers? He testified he could see them, and he marked on a photograph that's in the record. No, but he said he could see one of them, and one of them said they couldn't see him. Kristen Bilyeu was behind the wall, and Deputy Vores said he could see my hands. It's a very close quarters, very small space, and Kristen Bilyeu is the one who testifies, based on what she observed, Mr. Brown definitely would have stabbed Deputy Vores and probably would have stabbed her. So the undisputed facts are pretty clear. Their distance estimates that are based on various types of questioning, they are from 3 to 8 feet. I don't know if there's any case that I'm aware of that says that there's a constitutional distinction between 3 to 5 feet and 6 to 8 feet. It goes to the imminence of the threat and how far the victim would have had to have gone in order to have used the knife on the other two people. Yeah, I don't know that you have to wait beyond 3 to 5 feet until something more dreadful happens for an officer to act. I don't think that a civilian would have to do that. Counsel, in this case, the decedent was on his knees, surrounded by officers. If I understand it correctly, they had been notified by family members that he'd been acting strangely, and I gather there is a code that notifies the police that a mentally disturbed person is involved. Is that correct in this case? I'm not sure there was a code involved in this case. It was a threat. Your client knew that this person was mentally disturbed. They had information that he was mentally disturbed. Okay, so he knew that. Why the reaction to immediately go for a firearm as opposed to, say, a taser or something like that? Isn't there any kind of training that an officer receives that something other than lethal force is permissible to save and protect one another in this situation? Yes, and when it can be used, they will use that. Deputy Vorious testified he had his taser out, and he was switching at the time that Mr. Brown moved forward, he was switching from his taser to his firearm because a taser is not effective, first of all, in close quarters. If you've had any taser cases before, you have to get enough of a spread, be far enough back, to get a spread that's effective. You have clothing interrupts. We find that tasers are ineffective about half the time, so it's not something you can use. Why did he draw it to begin with? Pardon me? He drew the taser to begin with. He had the taser out, prepared to use it, but when Mr. Brown lunged forward with a knife, he was switching back to his firearm because he could not rely on the taser. I know, but why did he, and this may not be relevant, but why did he have the taser out to begin with if he was so close that it would not have been useful? As I understand it, he put down, forgive me if I don't have the facts entirely correct, but he may have initially had the gun drawn, then he put his gun away, then he took out the taser, and he was attempting to, he pointed it at the victim, and the victim spotted the red light and said, don't tase me. He was prepared to use it if he needed to, and then... You just said that it was not effective at short distance. Well, at first he was farther back. They were all talking to Mr. Brown. They talked to him for quite a length of time, and so they were prepared to use whatever they needed to. They didn't know which direction he was going to go and what he was going to do. They didn't know if he was going to drop the knives, so they're prepared to use less lethal force if it's possible. At the moment of the lunge, the taser would not have been effective. I think we sent out an order that asked you to be prepared to discuss Hughes versus Kissela. And Hughes is, Ms. Hughes was walking down her driveway with a kitchen knife held down, and she wasn't threatening anybody. That's factually distinguishable from this case where Mr. Brown was lunging forward with a knife and threatening a deputy, and according to Kristen Voorhees. I'm sorry. I mean, what was the victim here threatening? What was he threatening? Yeah. He was threatening the two deputies with a knife pointed forward. No, no. I mean, verbally. I mean, the difference is the police in Hughes versus Kissela, which I believe is a public record. There's maybe a petition for re-hearing on bond pending. Um, but why did the police know there? Well, they knew that she was, she had some... They had been called. She had some mental problems, but there are Supreme Court cases, the Sheehan case, I believe, where just because somebody's mentally ill, if they're using a deadly weapon, that doesn't affect law enforcement's ability to do what they need to do in order to protect someone from serious bodily injury. And I take it for your argument, for qualified immunity purposes, Kissela wasn't before the police officers when this incident occurred. The, I'm sorry? The Kissela decision was not at the, at the, at the ready for these police officers when they went into the house. That's true. For qualified immunity purposes. For qualified immunity purposes, that's true. Counsel, I gotta tell you, but for White, um, uh, if this were before us, I would want to send it back for trial, because they're conflicting views. You've got a mentally disturbed man. They've been talking to this man. He's on the floor on his knees. They knew he had a knife. They knew that from the beginning from the family members. Um, I know the police have a very difficult job. They're trying to protect the public, also themselves. They have that right, therefore the qualified immunity, but doesn't make any sense. Even if, even if we are required to give your client qualified immunity, doesn't make sense in this case to write this up on the basis that this would be a violation of the decedent's constitutional rights, but for the qualified immunity. So that going forward, people are on notice, you can't do this stuff. And, and that's part of my argument. But my argument. You're in favor of that. I'm in favor of that. Good. Um, and the case, this is a qualified immunity appeal, so the case could go back to the trial court. I just want to make sure you understood Judge Smith's question. What he's just saying, just so we're clear, so we don't have the letter coming next week. He's saying. I'll watch the video. He's saying that, wouldn't it make sense, listen, listen closely, for us to say this was a Fourth Amendment violation, but there's no liability because of qualified immunity. And you said yes. Well, and I was going to say, but my view of this is that this is not a Fourth Amendment violation because of the action of, of Mr. Brown, uh, you, wielding that knife and lunging at deputies. That's the, so the first prong of the analysis. And then we get to qualified immunity. I didn't understand that he was lunging at anybody. Well, that's the testimony of all of them, that he was moving forward within a very close distance. He was on his knees as an issue of fact as to whether he was trying to, to get up from his knees. But as far as the, as far as the, what we have to assume is the facts most favorable to the point, if he was on his knees. Well, all three of the deputies testified he was getting up from his knees, all three of them, and moving forward with a knife. And Kristen Billy is the one who said that Deputy Gores would definitely have been stabbed. But for the actions. Once your client on the side, the others were in the front, they didn't take out their guns and shoot him. But they, because they saw what he was doing. They'd been talking to him. They didn't have time. What do you mean they didn't have time? Because your client shot him too fast? He pulled that knife out and lunged forward instantly. How quickly did your client shoot this man to death from the time he pulled out the knife? It was a matter of seconds because. Matter of seconds, right? Yes. No discussion. Yet these other officers have been talking to him for how long? 15 minutes? Five, five minutes. Five minutes. Yeah. They're having a conversation. He was a mentally disturbed guy. And all of a sudden he's dead. That's not helpful. It's Adrian Moses' perception that he was going to stab one of his colleagues. He testified it was an imminent threat. He saw the knife blade going forward. The other deputies both testified they thought they were going to be stabbed. Those are the undisputed facts. The factual discrepancies of distance estimates and being on the knees are not, ignore the undisputed facts. With respect counsel, again, qualified immunity aside for a moment. Normally what we would do here is have a jury decide this. You know, the testimonies of the different officers, they had different perspectives, they did different things. And the jury would say, you know, we believe Officer Moses or we don't believe Officer Moses. We don't have that liberty because of White versus Polly and other similar cases. But going forward, doesn't it make sense to make it clear that you look at the totality of the circumstances in terms of viewing whether or not there's been a Fourth Amendment violation? I think you always do that, true. Right. And I think if you can particularize in this case for clearly established law purposes, that would be helpful to all of us, I suppose. We'll keep that in mind. I have one question. At one point, Brown asked Moses why he was pointing a gun at him. And Moses told Brown it was because Brown had knives on his person. And Brown offered to put the knives on the table, that is remove them from his person. And Deputy Moses told him not to do that. They do that because they don't want them pulling the knives out and using them or throwing them. So they wanted him, they had him put his hands over his head. And Deputy Vorhees was reaching in. They talked to him. They thought they had him turned down. He didn't want him to put his, he preferred that he keep the knives on his person rather than put it on the table. He wanted to keep his hands over his head because he had four knives so that they could reach in, handcuff him, and then remove the knives from his pockets for the safety of everyone there, even himself. Do you want to save any of your time for a rebuttal? I did. Okay. All right. Why don't you do that and we'll hear from the appellee. Good morning, your honors. May it please the court. Megan John, just representing the appellees in this action and the plaintiffs in the underlying action, minors SB and MB. To address one of the first points that the court raised with counsel for the appellants and that counsel for the appellants responded to is what cases were available to give the officer notice in this case that his actions would have violated. With that in mind, as you know, I'm sure you've looked at White versus Pauly. We are, of course, bound by vertical stare decisis by what the Supreme Court says. So we, you, to overcome the qualified immunity protection that's provided to law enforcement, you need to give us a case that a reasonable officer would have known that would have indicated clearly in this case to him that what he was doing was a violation of the decedent's constitutional rights. What is that case or those cases? The cases that that are relied upon in this case by the appellees is Herrera versus Las Vegas Metropolitan Police Department. Herrera what? Herrera versus Las Vegas Metropolitan Police Department 298 F Sup 3D 1043 District of Nevada 2004. Let's stop right there. So this is a district court decision not in California that doesn't control the officers. This court has held previously the district court decisions can give an officer notice. It is an in circuit decision. It is outside of the state of California, but it is part of the body of law that this court has recognized as case law that can provide an officer with fair warning as to the constitutionality of his actions. And what are the facts of Herrera? In Herrera, the decedent in that case was experiencing an episode of severe mental illness and delusion. Can you talk up a episode of severe mental illness and delusion? He was staying with his mother in her residence in Nevada. She became frightened by his behavior and reached out to some social workers who had previously worked with the decedent in the past. They arrived. They found the decedent in an extremely agitated state. He was holding a small paring knife at his side. They exited the home, the mother and the social workers. Police were called to assist in transporting him to the hospital. As the officers arrived, they were advised of the mental health condition of the decedent. They were told that he did not have any access to firearms, that he was alone in the house, that he posed more of a threat to himself than anybody else, had no history of hurting others, and had not been taking his medication. The officers discussed ways to take him into custody and get him transported to the hospital and decided to approach him with a can of pepper spray that was roughly the size of a fire extinguisher, as well as a less lethal, what's referred to at times colloquially as a beanbag shotgun. They approach. They are given a key to unlock the door that had been given to them by the mother of the decedent. They attempt to unlock the door, and each time they do so, the decedent relocks it. Eventually the officers kick the door in. They see him holding a knife, holding the knife. They back away. They're in a semi-circle in front of his home. The plaintiffs in the case had claimed that at that time he was approximately 10 to 15 feet from the officers. There was disputes of fact as to what exactly occurred when the first use of force was deployed, and that was the firing of At that point he fell to his knees. They tried to knock the knife out of his hand with their batons. That was unsuccessful. He was then pepper sprayed. Despite having been shot with the beanbag rounds and pepper sprayed, he was able to rise up, and that's where the versions of events diverged. The officers claimed that he was moving towards them with the knife, screaming that he was holding it up to his ear like an ice pick, and the plaintiffs had presented evidence that showed that he was simply standing in the doorway with the knife raised in a skyward position. He was shot several times after that. The district court denied summary judgment. It also denied qualified immunity. It found that based on the factual record before it, assuming that the facts were viewed most favorably to the plaintiffs in the case, that there was no criminal activity at issue, just like we have in this case. This is a help call. This is what's referred to as a 5150 call, where an individual who's emotionally distraught or mentally ill needs help and is not committing a crime. Also important to the district court in that case was severity of the force that was used ultimately against the decedent, and that was lethal force. Important also to the district court was that on the plaintiff's version of events, there was no considerable threat to the safety of the officers. The resistance that the decedent had displayed was due entirely to his delusional and, you know, mentally unwell state as opposed to being an intentional act of resistance. There was no evidence of exigent circumstances in that case, which the district court found did not warrant the haste with which the officers pursued the situation. Following up on Judge Owen's question, this is a district court case in Nevada. This case, of course, occurred in San Diego. Is it reasonable to believe that Officer Moses would have had knowledge of that case, and if he did, that he would believe that that would instruct him on whether what he did was a violation of the Fourth Amendment rights of the decedent? Yes, Your Honor. The case law that an officer is held to have notice of is case law within this circuit, and that is... How far out? How about an Arkansas district court? Would that be enough? There are times where that can provide notice, but the typical standard is United States Supreme Court decisions, precedence of this court, as well as district court decisions within this circuit. In the San Francisco v. Sheehan, the court said, finally, to the extent that, quote, a robust consensus of cases of persuasive authority could itself establish a federal right that respond in the ledges, no such consensus exists here. Does one out-of-state, albeit in circuit, district court case constitute a robust consensus of cases of persuasive authority? No, Your Honor. A single case... We would not be arguing that a single case would establish a robust consensus of authority, but the Herrera case is not the only case that was relied on here by the appellees and plaintiffs in the case. Glenn v. Washington County, which is the decision of this court, albeit is distinguishable in some respects, but has a lot of the same issues that are presented by this case, as was this court's decision... Let me get to the issue of the level of generality, and that's what the Supreme Court's concerned about, is that the average police officer or law enforcement officer has no real way to know whether what he or she does is a violation. And I guess what we're dealing with here is, how was Officer Moses to know that what he did was a violation of the constitutional rights of the decedent? When you look at this court's case law, the precedence that it has in Dior v. Rutherford and Glenn v. Washington County, the Herrera decision, which Glenn and Dior were both cases relied on by this court and Hughes, as well as supporting that there was clearly established showing a constitutional violation in that case, there's never going to be a case that's on all fours with these cases. And a case... Are they on all fours or are not? No, there's very rarely there's going to be a case that involves exactly the same facts as what we have here. Each, especially in the Fourth Amendment context, which is incredibly fact-specific, and as this court is recognized, as the Supreme Court is recognized, there are always going to be differences. The issue becomes then, how similar are they? Is it enough to put an officer on notice? We don't need to have a fundamentally similar case. We don't need to have a materially similar case. Is there any significance to the fact that the police officer Brown said to the victim, or rather than Brown is the victim, that Moses said to the victim after telling him to get on his knees, he told him, quote, if you go for the knife, you will be shot. Was he, was essentially, I mean, this is, we're not talking about a statement that was made an last five minutes. There is significance to that statement. It is, it is one of the warnings that was given in this case. And, you know, that comes from the testimony, I believe, of Deputy Voorhees. Deputy Moses, I don't believe, has testified that he said that. Deputy Ballew has not testified that she heard Deputy Moses say that. Yeah, I'm sorry, Deputy Voorhees said that. You are correct. That's fine, Your Honor. And, but at the same time, we also have a factual record here, which demonstrates that Mr. Brown, while was having difficulty understanding, comprehending what the officers were telling him to do, his response, at times he was compliant, his response was at times delayed. All of the deputies testified consistently that they believed they weren't getting through to him, that he was having a hard time comprehending what they were saying and a hard time expressing himself that afternoon. And that constitutes, by the way, I don't mind, I apologize for interrupting you. There's this statement, if you go for the knife, you will be shot. And then there was a subsequent statement that Deputy Voorhees heard Moses say, don't do it, don't do it, as he went for the knife. Are these undisputed facts? The second fact, Your Honor, is not. The don't do it, don't do it, we believe is disputed by the testimony of Deputy Ballew, who testified during her deposition that she did not hear Deputy Moses. I can't, I'm sorry, could you speak or raise the mic? The dispute as to the first, the first comment, if you go for the knives, you will be shot, that comes from the testimony of one of three deputies. Now, I don't have any, I don't have evidence in the record to dispute that that deputy did not hear that statement, but what I can tell the court is that no other deputy testified to that statement being made. As to the second statement, the don't do it, don't do it, which comes much closer to the time when Mr. Brown is allegedly reaching for this knife and bringing it forward in front of his body, that is a fact that is disputed in this case. And what is, what's the cause of the dispute? I mean, what makes it a dispute? Deputy Ballew, who's in this room present in the kitchen with Deputy Voorhees, testified during her deposition that during the 15 second period of time that preceded the shooting of Mr. Brown, she did not hear Deputy Moses give any commands. She did not hear Deputy Voorhees give Mr. Brown any commands. It was her testimony that she was the only person who was talking at that time to Mr. Brown, and she certainly didn't testify that she told Mr. Brown, don't do it, don't do it. And that testimony appears in the record, your honors, at excerpts of record pages 189 to 190. 189 to 190, bottom of 189 onto the top of 190. In terms of the court's analysis of the issues in this case, the immediacy of the threat that is posed by Mr. Brown is a central issue, as it is in these cases. There are other issues here that do inform the court's analysis of the reasonableness of the use of deadly force here, and those issues are the subject of significant disputes. Some are undisputed, and some of those weigh in the plaintiff's favor, the severity of the crime and the other circumstances that are being committed. This is a mentally ill man. He hasn't committed any serious crimes, any violent crimes. He's made a very general threat to hurt someone, and perhaps had been acting aggressively, but there's no crime in progress. When the deputies arrive, he's in his own home. Nobody has said he has access to any weapons other than knives. Whether or not this is even an arrest situation to trigger another factor, this court considers. Counsel, with respect, does it make any difference the fact that the decedent was mentally ill, was acting strangely? If an officer feels that his or her life is threatened, it doesn't matter whether a crazy person is doing it or not, does it? Your Honor, as this court has recognized, the issue of mental illness, when it's apparent to an officer, does inform an officer's tactical response, and that tactical response then becomes... So as we analyze, not for the qualified immunity purposes, but as we analyze whether there's a Fourth Amendment violation, we should, in your view, take into aware of the mental state of this now decedent, what his mother had said, his actions, what he said when they spoke to him, and should that, as a matter of constitutional law, be a variant that should be considered? Yes, Your Honor, I believe it should. The tactics that officers employ when dealing with individuals such as Mr. Brown are quite different than the tactics they employ. That's a complete distinction between the types of suspects that officers encounter. And when you have somebody like Mr. Brown, who's clearly having an episode of mental illness or emotional disturbance, the way that an officer pursues that situation so often will dictate the outcome. And when you enter a man's home and you point firearms at him... How do you tell who's more dangerous? I mean, somebody who's mentally disturbed? I mean, we've seen over the last few years mentally disturbed people, certainly in Connecticut, kill. I mean, I don't know that you could assume that just because somebody is mentally disturbed that they're not as much of a danger to kill as someone who is an armed career criminal. No, certainly. And our position in this case is not what the Court has rejected in the past, which is to create two tracks of an those who are of sound mind. Can I ask you a question out of curiosity? You know, as I read a lot of these cases, it seems to me that the police officers are not really well trained enough to deal with mentally ill cases. And you dropped, you originally had a claim against the city of San Francisco. Why did you drop it? I mean, are they properly training police officers to deal with mentally ill people whose deaths could be avoided if these situations were handled differently? It's not my understanding, Your Honor, that there was a, what would be a Monel claim in this case, based on a failure to train. That was not alleged. There was a claim that could have been construed as a direct claim for negligence against the county in supervision and training, and that was not pursued at the summary judgment level, as there's California case law indicating that in that situation for negligent supervision, for negligent training, that there is no direct liability against the municipality in that circumstance under California law. A Monel violation was not alleged in this case and would not be something that we would pursue. Any other questions by my colleagues? Thank you very much for your argument. Counsel, you have a little bit of rebuttal time left. I don't really have much to add, except that... You don't need to take it, honestly. Well, just in view of this type of argument, it'd be nice if we could have some clarification on what clearly established law, at what level it's clearly established, because I haven't read those two cases before, and I don't want to have to get all my law enforcement officers a Westlaw account, one of them's unpublished. So it'd be helpful, as Judge Corman mentioned from the Sheehan case, to have some sort of language about what's clearly established in the Ninth Circuit. Thank you. Thank you, Counsel, for your argument. We appreciate it very much. The case just argued is submitted.
judges: M. Smith, Owens, Korman